v. M.H.T. Mr. Strother? May it please the Court? Your Honors, this case has significance not just for the parties in this lawsuit, but also to an entire industry of small-ticket financing companies and small businesses. The District Court's rulings, in our opinion, are not just legally wrong, they are a threat to the mere, the simple existence of a small-ticket financing company industry, and they imperil the existence of small businesses through the ability of small businesses to have access to capital to operate and grow their businesses. Here's why. The District Court imposed draconian admissibility and authenticity requirements of evidence at the motion for summary judgment stage. This was in violation of Federal Rule of Civil Procedure 56C. The District Court essentially insisted on physical presence of the lender to be there at contract signing. That's the impact of the Court's rulings. That's an antiquated notion that disregards modern business practices and ignores the realities of commerce in this digital age. By erroneously striking this crucial evidence in contravention of Rule 56C, the District Court effectively dismantled a small-ticket financing company's ability to enforce its agreements and pursue straightforward collection cases. In essence, what we seek to uphold is not just Balboa's interests, but the very fabric of small-scale commerce. The ramifications of allowing the District Court's ruling to stand would extend far beyond the confines of this courtroom, striking at the heart of entrepreneurial endeavors and consumer access to essential financing. It would be useful for me to explain a little bit more about what small-ticket financing is, why I'm using those words. It's generally defined as financing to the tune of $250,000 or less, and its striking characteristic is that the lender is not intimately involved in the underlying transaction. The way that that principle operates is it allows the small-ticket financing company to finance dozens of these transactions a day, sometimes 100, sometimes hundreds. To a layperson, I think I could best equate it to when a person goes to a Home Depot or a large furniture store and wants to make a large purchase, they prefer to finance it. And so at the checkout stand and when talking to the salesperson, what the purchaser will do is allow the salesperson to put them in contact with the small-ticket financing company. All that's required to get that transaction up and running is some credit information, name, copy of ID, Social Security numbers, and as soon as the credit report comes back okay, that person is creditworthy, the transaction is green-lit. Then Home Depot, the furniture company, presents all of the sales documents for the purchaser, who I can also now call the borrower, and also the small-ticket financing company's loan documents. The district court in our case had a big problem with that, and basically at the summary judgment stage said, there's no way you can ever show me that those are authentic. You don't have— That's particular to these transactions, though. I mean, everything you've described up to this point, all well and fine, but here the problem is none of the physicians or the LLCs may have ever seen the invoices or may have never seen the loan documents, as you call them, because even in Balboa's Welcome Packet, those key documents were not included. I mean, that's undisputed, isn't it? One of the things you said is, I think, disputed, in fact, if it's undisputed, it's undisputed the other way. The doctors saw the loan documents, meaning the document that they signed, the IPA or the— The invoices have to be coupled with the loan documents, as you call them, the MAs and IPAs, to have the terms of the loan. They do not, under California law—and California law is what is governing these agreements—under California law, they absolutely do not need to be attached physically, accompanied— But they've got to see them. They've got to know about them. That's not true, Your Honor. Judge Wilson, the California case law is Shaw v. Board of Regents, and all of its progeny, which we cited at length in our briefing, in which opposing counsel admits it's good says that it's not necessary for the doctors, the contracting parties, to see the incorporated documents. All they have to do is be easily available. So they have to see them, or they have to be made easily available, and the long line of cases regarding what constitutes easy availability is all—there's a string site where Shaw goes through them, the court of Shaw. Well, so what evidence is in the summary judgment record—let's put aside the declarations that the court struck for the moment—what evidence is there that shows that the documents were easily available, that they saw the documents, that they could couple these two documents together and know what they were agreeing to? The summary judgment evidence is this, Your Honor. You have the welcome package explanation that indicates that these borrowers can go online and set up an online account and get all of them. But didn't include the invoices. Your Honor, I disagree. It actually explicitly did say the invoices would be available for download. No, no, no. The welcome packet did not include the invoices. The welcome packet did not include the invoices. The welcome packet included instructions on how to go online and set up your account so that you could access everything, including invoices, which is what California law says is okay. There's a long line of cases that we cite in our brief that shows that if they're available online through clicking, that is easily available under California law. And so it's not that BOA had to provide them, they just had to be easily available. So what, you asked, Your Honor, what's in the record, and the record is all of the borrowers were told in the welcome packet that they could obtain these documents. Additionally, the other part that's in the record, Your Honor, is within the IPAs and MPAs themselves. But they don't have to be both known to and made easily available. They just need to be one. If they're made easily available, then the onus is on you to go and look for it so then it's known to you. Absolutely. Absolutely, Judge Graves. The words of the Shaw Court are this, the terms of the incorporated document must be known or easily available to the contracting parties. And the California courts have held that merely giving the explicit name of the documents, invoices with the capital I in our case, is enough to make them easily available or enough to trigger the obligation to ask for them by name. That without contrary evidence suggests that they are easily available. And so, Your Honor, Judge Wilson, I would say there's nothing in the record to the contrary that I think they were not easily available, even striking Mr. Rasmussen's and Mr. Byrne's declarations. What other evidence is in the record, other than the declarations that were struck, that would support the proposition that the doctors or the LLCs, the contracting parties saw the IPAs or IPAs? Your Honor, I don't believe that there is any evidence in the record to demonstrate that they actually did see them or that they actually did ask for them. But that's not what's required. The theory is they were easily available, that's... They were easily available. And there are a couple other details. I mean, and the, I believe it was the IPAs, which we excerpt and show you a picture of in our reply brief, they initial that portion that shows that they understand that those are being incorporated. The other document, I believe, indicates these invoices are going to be kept among our records and easily attainable for you. So this is a document... Well, but wait a minute. I think what they initialed was something about Exhibit A-1, right? Exhibit A-1 invoices and schedules was the full thing that they initialed, Your Honor. That would be on... But the district court concluded that there was nothing really to connect these particular invoices, the ones that were included in Exhibit C of the declarations, were actually Exhibit A-1. True. And that was, I insert, an incredibly erroneous error because it was based on an erroneous understanding of law. California law doesn't require that. The district court got caught up in whether Papoa, upon receiving a digital document, somehow stamped it with the words Exhibit A-1, even though the IPA and the MPA referred to them, Your Honor, by Exhibit A-1 invoices. And if you'll look at the invoices, there's up in the right-hand corner in all caps, invoices. So the idea that... There's nothing... I mean, I think you're oversimplifying what the district court did. There's nothing to indicate that these invoices are Exhibit A-1. Well, Your Honor, you're allowing us to look at what the summary judgment record should be, which includes the declarations of Mr. Byrne and Mr. Rasmussen, because they make it clear that they have the capacity and understanding to connect the dots. They know how the system works. They find it trustworthy. They go through all of the necessary requirements of Federal Rule of Evidence 8036 to indicate that these are indeed authentic. But that kind of skirts past the more important point from our vantage, Your Honors, and that is that Rule 56C is not ambiguous. Neither are these court's rulings that interpret Rule 5060 and enforce Rule 5060. Those would include the Maurer case from 2021 or 2022, Your Honors, which we cite at length in both of our briefings. And we wrote a 28J letter earlier this week regarding this court's 2023, December 2023 ruling in Donaldson v. McLeish. In both of those cases, the court makes clear that Rule 56C is unambiguous. District courts cannot exclude evidence at the summary judgment stage based upon admissibility. Full stop. Full stop. This court violated, I'm sorry, the district court violated Rule 5060 and violated this court's precedent by writing the order to begin with that says these are inadmissible. That alone is enough for this court to be required to reverse that. The district court made an error based upon a pre-2010 version of Rule 56. Nowhere in the court's order does it perform an analysis of the capability of these documents to be admitted at the time of trial, which is what Rule 56 in this court requires. Nowhere did the court state that these documents are incapable of being admitted. That's the evidentiary issue that everything in this case ultimately turns on. It's also worth pointing out, Your Honors, that the defendants in this case, our appellees, never did an appropriate objection under Rule 56C. They objected to the admissibility. Now, I know my opponents will stand up here, as they've done in their briefs, and say, well, perhaps you, Mr. Strother, you should have turned around and told us that we made an incorrect objection so that we could have fixed it or so that the court wouldn't go ahead and make the error. I assert that that is a top satirical understanding of the way the adversarial litigation system works. That basically would have them deputize me as their legal associate to tell them, hey, you really need to go back and look at the Federal Rules of Civil Procedure and look at Rule 56. It doesn't allow you to object. More importantly, however, is that the comments to that change in 2010 articulate what it is that someone is to do in Balboa's situation when an appropriate objection is made to incapability. And that is, Balboa would have a choice. Either explain how they can be later on put into admissible format or explain why they are already in admissible format. That's what we did. However, that doesn't excuse the district court from not delving into capability of being produced in an admissible format trial. Your Honors, when the summary judgment record is appropriately defined to include the declarations and therefore to also include the invoices, everything else in this case falls like dominoes because it's this court's first job to define what the summary judgment record is. This court should be overturning the evidentiary rulings based upon Rule 56C Marr and Donaldson. And then the court can begin its de novo examination of what the summary judgment record actually is. Do you agree that if the evidentiary ruling stands, summary judgment was appropriate? That's a tough question. I've thought a lot about it. That's why I asked. I wanted to hear your answer. Understood. The answer is I think that there is a pathway through because all of the mutual assent findings of the court can also be answered by other items and can be addressed by other items in the summary judgment evidence. Let me give you an example. One of the chief parts of the district court's order on mutual assent is that the defendants had asserted that against all logic, that while their sales agreement was between MHT and the doctors, my client Valboa, the financing company, was supposedly supposed to do nothing more than take money on one hand from the doctors and then pay it over to MHT. Pay monthly. What financing company charges a borrower monthly to then go out and just turn around and pay it? It's a glorified gopher. It makes no sense. It flies in the face of the language of the contract. So that alone, I think, is enough to render, even without the declarations, without the invoices, to render the summary judgment ruling incorrect. What the court did below is conflate concerns about veracity with admissibility. And that is something that this court has held in the past, is automatic reversal error. That's the Heinsen decision for this court in 2016. The other, in my remaining time in the opening, I'd like to address the concept that a business records custodian somehow needs personal knowledge of the transaction itself, because that was one of the other issues, much in line with your questioning, Judge Wilson. One of the issues that the lower court had never has it been held that a business records custodian has to have personal knowledge. In fact, if you go back and look at the Okolodja case from this court in 2021, it's clear that a business records custodian only needs to have knowledge of how the records were kept, not what the records show. And that's what we did in our case here, Your Honor. And I will yield until my final time for five minutes. Thank you. I proceed. Good morning. May it please the court, my name's Dana Campbell, and I'm here today with George Hampton on a case where we sought to finance a license agreement for software to receive medical records from nurse practitioners that would go out into the field and collect data on the patients. They never, in fact, received anything, no license agreement, no iPad, nothing. While they received nothing, including an invoice relating to a transaction, they've been sued for hundreds of thousands of dollars based on an invoice that I believe the record shows and Mr. Shredder concedes was never provided to them. And in fact, an invoice relating to a transaction was never consummated. The court made two rulings, the district court made two rulings, if I can let you recognize. One, an evidentiary ruling sustaining certain objections to the evidence upon which Balboa relied, and a ruling rejecting the incorporation by reference argument under California law and granting summary judgment. In our argument today, I will be addressing the evidentiary rulings and Mr. Hampton will be addressing the incorporation issue. As the court knows, there's over 30,000 pages in this record, and we've tried for this whole argument to do the impossible. We've handed out some excerpts, and what we've tried to do is boil all of these 30,000 pages into 10 pages. So what we've given you today is we think that the 10 pages that you need to understand the evidentiary ruling and the actual record excerpts so you can read, we're not making it up as we go along. This all starts not with a party in this room. This all starts with Accentium Capital, which had been the original lender, and they are the ones that introduced Balboa to America's MHT that provided the basis for the fraud that's been committed. In our exhibits, you'll see the first document ever provided was the term sheet, and the term sheet is a very, very interesting document. We've heard a lot about lenders today and their practices, but the term sheet, oddly enough, provides traditionally these agreements only state the repayment term and amount. Only state the repayment term and amount. It doesn't say that the principles, you know, incorporated by reference. It says these agreements only include repayment term and the amount, and that, in fact, is true, and that allowed a fraud to be perpetrated on both Balboa and the doctors. Well, counsel opposite said that in the welcome packet that was provided to your clients, I guess, there would have been instructions for setting up an account, and they could have seen the whole thing, the invoices, the MPAs, the IPAs. Is that accurate? There is, in fact, a welcome disclosure page, if you will, but there's no proof whatsoever what was available, none. That's not in the record, and that, in fact, was not argued to Judge Lynn. That argument is being argued here today for the first time, and we've attached, it's in tab six. You can see what the argument was that was made in the district court. There was no argument that it was all there and available in the welcome package, but I would submit that's irrelevant. If you look at the second page of our... Well, it wouldn't be irrelevant if the documents were easily available to the doctors. That's what California law requires. No, Your Honor, I disagree completely. That would be true if something was contained in the agreement that's not, and that is language of incorporation. There is no incorporation language at all in the monthly payment agreement. In fact, the whole... What about the Exhibit A-1? Well, Your Honor, Exhibit A-1, it says nothing about terms and conditions. Exhibit A-1, in the monthly payment agreement, it says simply, see Exhibit A-1, invoices are scheduled, so it's not necessarily in the invoice, it could be in the schedule, for description of equipment and supplier, and it's very important to understand in this is a software agreement. The doctor had no reason to look at Exhibit A-1, frankly, for a description of the equipment and supplier. The equipment in this transaction is confined to a tablet. It's an iPad. No reason to look at that. It's like saying... Do you agree that something was going to be incorporated by that reference? No. No. No. And in fact, Your Honor, we know, and there's reference here, and we heard about it today, about how Balboa does small ticket financing, and there's a reference there to the New Image Dental case, and if you want to see the agreement that was a subject in New Image Dental, we provided for you in tab 7, and it's very specific, and there the agreement provides, and this would be necessary for their argument to make sense, it says the invoices attached here to Exhibit A and incorporated herein by this reference. If that language was in the monthly payment agreement and installment payment agreement, I would agree. They'd have an argument there. They don't have that argument. It doesn't say anything about incorporating Exhibit A-1, and moreover, we know it wasn't attached, although it's alleged that it was attached. Their Third Amendment complaint alleges that Exhibit A-1 is an attachment to the agreement. There's absolutely no evidence of that. And, Your Honor, if you look at the monthly payment agreement, it goes beyond that. It says that they paid to supplier the amount listed in this agreement and attached schedules. That's what the agreement says. That's what they pled. Nothing was attached. That's undisputed. They were not relying on this incorporation online argument that is being presented for the first time. Similarly, Your Honor, on the installment payment agreement, and this really goes to the point, both of these agreements refer to a licensed fee, and it's clear from the way that language is written, it wasn't a lump sum, and the doctors would have no reason to understand that it was. Specifically, on the monthly payment agreement, it says in paragraph 8, creditor has paid the license fee associated with acquisition of debtor's rights under the license agreement. So they've made the first payment to acquire it, but then goes on to say, you request that we pay supplier and you acknowledge that monthly payments commence. So clearly, it wasn't a lump sum payment because one payment had already been made, and we were now going to make other payments. It's even more clear in the installment payment agreement that debtor is obligated to pay vendors for the full amount of the fee needed to license the software and pay for related services. That's a defined term, the fee. It goes on to say, creditor and debtor have agreed that instead of debtor making payments of the fee to vendors, creditor shall instead make such payments, such payments of the fee on behalf of the debtor to vendors under the software documents. And that is the understanding that our clients had. They had a monthly license agreement that effectively could be terminated at any time. That was what they were represented by America's MHC, and it's completely consistent with the agreement. In that regard, Your Honor, there is incorporation language, I would point out, in the installment payment agreement. We're not going to run away from that. It says here that such detailed description shall be considered incorporated into this installment payment agreement, and that is a detailed description of the property being financed. That's what that's supposed to be, and that language, Your Honor, that incorporation language doesn't refer to Exhibit A-1. In fact, that language precedes the definition or reference to Exhibit A-1. And again, in the installment payment agreement, it does not provide that it's incorporated by reference. It provides only C Exhibit A-1 invoices or schedules for description of the equipment and supplier. So, on that basis, no, Your Honor, I don't believe it makes any difference, and it's not in the record that the invoices were available online, but even if there is some suggestion that perhaps they could have been obtained some other way in the absence of any incorporation by reference language, I do not believe it matters. Now, very, very important here, too, and key, if you have a question, I'm sorry, I'm sorry. Very key to Judge Lynn's ruling is, if you actually look at these invoices, we have them in tab three, the invoices not only lack the Exhibit A-1 designation that is referenced in the IPA and the MPA, they also lack any detailed description. In the IPA, it says that there's a detailed description, but if you look at the invoice, it's a one-line description, MHT license and MHT ACO with three iPads. That's hardly the detailed description that is suggested in the MPA and IPA. So, Judge Lynn properly found that there was no reason to understand, in the absence of any designations, Exhibit A-1, or that even it was inconsistent with the description of what Exhibit A-1 was supposed to be. Now, Your Honor, regarding the issue of Rule 56C-4 in Rule 901 of the Federal Rules of Okay, thank you. Regarding the issue relating to the authentication and personal knowledge, we took the depositions of Pat Byrne, who's the CEO of Balboa, and we asked him, had he read the IPA before? And his answer was, I'm not sure that I read this one, no. And I said, when you say this one, I'm not referring to this particular document, I'm referring to this particular form of installment payment agreement. Have you read it before? And he says, I'm not sure that I have. And then we went on to ask him further, do you know if there was an Exhibit A-1 in this document? And his answer was, I don't know that. That was the other basis for Judge Lynn's ruling. The sponsor of the Exhibit A-1 in the declaration had admitted in his deposition that he didn't know. Further, we deposed Sophia Fields, who's the Director of Operations for Balboa, about the welcome package. And her explanation why Exhibit A-1 wasn't included was because the welcome package, typically welcome packages are executed documents from the customer, suggesting, consistent with Judge Lynn's finding, that this exhibit was not part of the executed documents from the customer. And then we asked, and this is totally inconsistent with their argument here today about it's all on the web. We just get on the web, everything's there. But the customer doesn't ever get a copy. I don't think it's part of our practice to send the invoices. We just usually send the executed documents. That is the record evidence from the Director of Operations of Balboa, who is responsible for the welcome packages. So I went on to just summarize and I said, in terms of knowing what that transaction was actually consistent, you don't know if the customer has actually seen the invoice. Answer, no. I guess maybe no, other than they've initialed it. Well, the record clearly shows none of these invoices were initialed by any of the customers. So that's from the Director of Operations. We then deposed Robert Rasmussen, who's the Chief Operating Officer of Balboa. And we're asking him because such importance was placed on this verbal verification. So we asked him, are you aware of any written or verbal verification from any of the doctors that they received any of the equipment? And his answer was, I don't know. I have not looked at any of the transactions to my recollection before I came here. So Mr. Rasmussen had not even looked at any of the transactions before this litigation had been commenced and had been deposed. So we then get the declarations in this case. And we've got them side by side of Robert Rasmussen and Patrick Byrne. Mr. Rasmussen lays a general business records foundation saying that he's a custodian of records and that these records are prepared in the ordinary course of Balboa's business and then goes through Rule 803.6. What he never does is say that any of the documents that are attached to his declaration are in fact the business records. More importantly, he concedes, because that was actually the position Balboa was taking, that every aspect of execution of this agreement was conducted by MHC, not by Balboa. They didn't know anything about execution. They didn't know what was attached or wasn't attached. And in fact, while he conclusively fashion says that the visit attachment to Exhibit C is Exhibit A1, he acknowledged, and it's very interesting, it says MHT would then forward the signed documents to Balboa. So the declarants don't. I just want to be sure. Mr. Hampton has agreed that you can use all of his time. Y'all are out. You had your 10 and his 10. How much? Six. Okay. Then I'll try to do it in one. So, Your Honor, there was no abuse of discretion. Clearly no abuse of discretion by Judge Lynn based on these declarations. If you look, we've got it in tab 6, and it's very clear. Judge Lynn understands Rule 56. She asked Mr. Struther specifically, how are you going to prove it? It wasn't a case of, we've got a gotcha here, and I'm not going to give you a chance to explain to me how you're going to do it. She literally asked him straight away, and you'll see it. He said, I don't, Mr. Struther says, I don't think we have to prove that they've received Exhibit A1. And she said, okay, all right. We don't, that's our argument. And she said, if that's your position, then that's the way we will proceed. You're going to have to convince me of that. So it's not a matter that Judge Lynn imposed some draconian rule. And if you look at the cases, there's, in the advisory committee notes, Rule 56C, it's very clear. Everything changes when an objection is made under Rule 56C2. The burden is on them to come forward with evidence and in this reformer explain how they could do it. In this case, they simply said, we don't think we have that burden. So it's very unfair to now suggest that Judge Lynn committed error. Finally, again, Your Honor, there are numerous references to the small ticket financing. None of it's in the record. There are sites to cases. But if you want to see what their agreements look like in November of 2016, their equipment financing agreements, take a look at tab 7. You'll see it's exactly the same as the monthly payment agreement with one exception. There's no dollars. Thank you. How much time is left? That's fine. I'll be brief. I would also, may I proceed? May I please the court? In addition to Mr. Campbell's comments on the new image demo case, which is in tab 7, I would point out that in that case, the agreement that references A1, the invoice attached specifically is stamped A1. So there is no doubt in that case, unlike here, what A1 is. With respect to the incorporation by a reference, California law is clear that when a document is incorporated for a limited purpose, it is only incorporated for that limited purpose. And as Mr. Campbell noted, that the monthly payment agreement here said that Exhibit A1 invoices were scheduled for description of equipment and supplier, and the IPA says see Exhibit A1 invoices were scheduled for description of equipment and supplier. There is nothing here that says see Exhibit A1 or see the attached for purposes of additional terms and conditions. And I can give you a quick example. Yesterday, when I checked into my hotel room, I signed on a little electronic pad and said, see our timeshares for specific pricing details. Well, this morning, if I'd gone to check out and they said, sorry, Mr. Hampton, you were an hour late and you owe an extra day's fee. And I said to them, well, where is that? And they said, well, it was in our terms and conditions that were in the timeshare brochure that you signed for yesterday. Well, that's not how it works. The timeshare deals for the pricing details, not additional terms and conditions for my stay. In their reply brief, they challenged us to come up with a more recent case dealing with a corporation by reference for limited purpose. And I refer the courts to Michael v. Thiessen, which is 311 FSEP 170, which is in the Northern District of California in 1970. Lastly, even assuming that Judge Lynn's evidentiary ruling was incorrect, which we don't believe it was, there was no evidence in the record to support a finding that there was an agreement between the doctors and Balboa that a lump sum would be dispersed as opposed to the monthly payments. There was no agreement as to a loan amount and there was no agreement as to the interest rate. And with respect to loans, California law, it's clear that a loan, the loan amount and the interest rate must be agreed to for to have a mutual assent. Thank you very much. Your Honors, I'd like to clarify a couple of misstatements that opposing counsel made, number one, regarding the welcome package. It's entirely number one in the record. And also in our opening brief, on page six, we explain that the welcome package contained information about how to ask for the questions and ask for more documents. We cite it to the record at 36444, which is a copy of the welcome package letter that explains how you go online, how you can obtain your invoices and all the other financial information that you want. And what evidence is there as to what was online at that point in time? Only the declarations, Judge Richmond. The opposing counsel has misdirected the court regarding what is required under California law for an external document to be incorporated into a contract. The only and the best way for me to prove that is by giving you two quotes from cases from California. Neither of these have been challenged. They're in our briefs. The first I've talked about a number of times and it's sharp. The contract need not recite that it incorporates another document so long as it guides the reader to the incorporated document. There's no magic language. It has to guide. I mean, I guess my concern is I'm thinking about all the things I agree to online. And it's set up where I can't get this service. I can't buy this product. If I want to get the Internet in my hotel room, I have to agree to some terms. If I don't agree to those terms, I can't get it. But they can enter into a contract and all you have to do is reference that the rest of it is available to you online. But you can go ahead and sign everything without ever reading the terms of that contract. And under California law, that's all right. Actually, that could be a contract of adhesion, what you just described, depending upon the circumstances of the actual transaction that you're undertaking. Balboa's transactions have been tested by California courts. We've cited to a number of those cases that show that the way that Balboa organizes these agreements is enforceable. But, Your Honor, I mean, there's no other way to answer it. But, yes, there's a long line of cases. Rental cars, you're bound by what's on the wrapper of your rental car agreement. Even with software, you just describe something. What's on the wrapper? Are you talking about a piece of paper? Well, an envelope in which they put your agreement. Maybe it's in the glove box. Maybe they hand it to you. But what you also described is click wrap, which is not just enforceable in California. But I think if we were to check it out, it's enforceable almost anywhere. That's why it exists. You have to click on something. Like you used to have to open a piece of software or whatever to accept the terms of the limited license when you open a CD. But they clicked on something that said they read it or agreed to it. No. No, Your Honor. That didn't happen here. There's no evidence that happened there. We don't believe that they made any requests. But that gets to my second quote, and this is from the Robinson v. Onstar case from California. Under California law, whether or not the signatory actually requested or read a secondary document has no impact on whether those terms were validly incorporated into the agreement. That's the law, Your Honor. But actually read is different from saying actually presenting it to me for reading. Well, Your Honor, the language said requested. Like whether they requested it is not even an important detail about whether it's a valid part of the agreement. All that matters under California law is that it's easily available. And no magic language about this document's incorporated. You just have to be guided to it with appropriate language, which the IPA and NPA have. Your Honor, a couple of additional comments. The IPA and NPA, contrary to what opposing counsel said, are not counselable. Meaning if the doctors had an issue with the vendor, MHT, and MHT disappeared, which by the way happened, they declared bankruptcy, the doctors would still have to pay monthly payments, 66 payments to Balboa. Those IPAs and NPAs have what is colloquially known as a hell or high water clause, and it's explicit. They're not counselable. And in fact, Your Honors, this is in the record. These appellees were plaintiffs in a class actions case called Melby in the Northern District of Texas. Despite the fact they never paid Balboa any money, despite the fact they never paid MHT any money or any other lender any money, they walked out with tens of thousands of dollars each in their pockets. Leaving this lie the way it is, they walk away with a windfall. The final thing is Mr. Hampton mentioned limited applicability. 1906 and 1869 cases, they're bad law and inapplicable and distinguishable. Thank you. Thank you, counsel. That will conclude the arguments. The cases that the court has heard this week are under submission. The court stands in recess. Thank you.